Filed 1/26/15  T.M. v. Super. Ct. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| T. M.,<br><br>        Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF CONTRA COSTA COUNTY,<br><br>        Respondent;<br><br>CONTRA COSTA COUNTY CHILDREN & FAMILY SERVICES BUREAU et al.,<br><br>        Real Parties in Interest. | A143442<br><br>(Contra Costa County Superior Court No. J13-00933) |

Petitioner T.M., mother of R.S., petitions this court to set aside the juvenile court's October 22, 2014 order denying visitation, terminating reunification services, and setting a February 13, 2015 hearing pursuant to Welfare and Institutions Code section 366.26[1]. For the reasons given below, we deny the petition.

**FACTUAL AND PROCEDURAL BACKGROUND**

R.S. is not yet two years old.  When R.S was approximately two months old, the Contra Costa County Children and Family Services Bureau [agency], filed a section 300, subdivision (b) petition alleging that he was at risk of harm due to domestic violence between his parents occurring in his presence; additionally, he was dirty and his mother

---

[1]Unless otherwise noted, all statutory references are to the Welfare and Institutions Code.

1

possessed marijuana. On August 5, 2013 the alleged father and T.M. were pushing one another and the father punched T.M. in the mouth with a closed fist. Their house was described as uninhabitable, due to animal feces, urine, and mold throughout the house and broken glass and windows, which allegedly was due to the parents' fighting. On August 7, 2013, R.S. had "obvious and copious amounts of dirt encrusted beneath" his nails and had matted and dirty hair. It appeared that he had not been bathed in a long time. A bag of marijuana and scattered leaves were found in the mother's motel room. The juvenile court ordered that R.S. be detained on August 12, 2013. At a jurisdictional hearing on October 2, 2013 the juvenile court sustained the allegations in the petition.

On October 29, 2013 the agency requested a one-month continuance of the dispositional hearing to allow it to complete its assessment. At that time, R.S. was in a licensed foster home; his mother was homeless and lacked a working telephone. In its disposition report, prepared for a December 2, 2013 hearing, the agency reported that the mother had "a serious cognitive delay," but did not participate in Regional Center Services.[2] The mother indicated that she believed she received a quarterly check from the Regional Center and that she had a Regional Center social worker, although she did not know her name. The agency social worker instructed T.M. to inform the Regional Center as soon as possible about what was transpiring in her life.

The report documented that the mother had been brought up in foster care and had a history as a victim of abuse, molestation, and neglect. The mother had been removed from her own mother in 1989; she was put up for long-term foster care in 1990. T.M. had one older child, for whom she was unable to care and whom relatives adopted. She suffered from post-traumatic stress disorder in the past, but denied any current mental health issues. She had seen a therapist previously, but was not currently seeing one.

---

[2]Regional centers are nonprofit private corporations that, under contract with the Department of Developmental Services, provide or coordinate services for people with developmental disabilities. (Information About Regional Centers (June 5, 2014) <http://www.dds.ca.gov/RC/Home.cfm> [as of December 26, 2014].)

In the fall of 2013 the social worker and two parent partners[3] met with the mother. One parent partner had obtained a residence in a shelter for the mother, but T.M. did not follow through with calling the shelter. The social worker had arranged for drug testing for the mother, but T.M. was not participating. The social worker noted that the "mother presents as cooperative and polite and states she wants to have her child returned to her care but is unable or unwilling to follow through with any instructions." When visiting the infant, the mother was "loving, pleasant, and interact[ed] appropriately." She had missed a few visits due to transportation issues.

The mother's criminal history included arrests for inflicting corporal injury on a spouse/cohabitant and assault with a deadly weapon. In addition, she admitted to filing a false police report regarding the incident that led to the agency's involvement in this case. The social worker also noted that the mother had had issues with personal hygiene, truthfulness, and structure when she was a dependent child—all issues that continued to limit her ability to care for her child and to make safe choices.

The December 2 report indicated that the following services had been provided: (1) placement for R.S.; (2) medical care for R.S.; (3) bus/BART tickets for T.M.; (4) parent-social worker; parent partner meetings; (5) referrals for mental health therapy/assessment/evaluations; (6) supervised visitation; (7) referral for parent education; (8) appointment of two parent partners to assist the mother; and (9) referral to shelters. On December 30, 2013 the juvenile court adopted the December 2 recommendations and ordered visitation and reunification services.

On June 11, 2014, the agency submitted its status review report for the six-month review, which recommended that reunification services be continued. The report indicated that initially the mother had a difficult time engaging in services. She did not follow through on an opportunity to enter a drug rehabilitation program; she was living

---

[3]"Parent partners" are parents with experience in the child welfare system who mentor and advocate for parents currently involved in that system. (California Evidence-Based Clearinghouse for Child Welfare <http://www.cebc4cw.org/topic/parent-partner-programs-for-families-involved –in-the-child-welfare-system/> [as of December 29, 2014].)

3

on the street and was disheveled. However, in January 2013 she entered the Orchid Rehabilitation and Treatment inpatient program for one week. Then petitioner went "AWOL" for "at least three weeks." Ultimately, however, the mother re-contacted the agency, saying that she wanted to enter another inpatient program. On February 19, 2014 she entered Project Pride. Her first few weeks of treatment were difficult—with her focused on how long she had to remain in the inpatient program and saying she did not understand why she had to have a restraining order against the alleged father of her child. By the end of March 2013, however, the mother was more focused on how the treatment was progressing, saying that for the first time in her life she saw things "clearly." She revealed that she was four months pregnant, stating that she would deliver the baby free of drugs. She also inquired about how to obtain a restraining order against R.S.'s father. During this time period, the supervised visits with R.S. were going well. T.M. had also had three successful overnight visits. She tested negative for drugs, was receiving prenatal care, was progressing in obtaining the restraining order against R.S.'s father, and was in contact with her Regional Center case worker.

Because of concerns that the mother not be overwhelmed by the two babies and her rehabilitation/sobriety, the agency did not recommend providing family maintenance; it did, however, anticipate, that if things continued to go well, she would receive family maintenance services at the 12-month review. In other words, it anticipated that at the one-year mark T.M. and R.S. would be successfully reunited and it would shift its efforts to maintaining the family unit. Overall, its assessment was that although T.M. was "quite vulnerable with fragile emotional health," she was learning effective coping skills and was willing to seek assistance when needed. It was considered essential that she remain in her current program, which would allow her to focus on her substance addiction and her parenting skills. She was described as "thriving in her treatment program." On June 11, 2014 the court found that reasonable services had been provided and ordered that the agency's June 11, 2014 reunification plan be implemented.

Several weeks later, T.M. gave birth to a baby boy. As reported in the September 29, 2014 status report, her situation gradually deteriorated while she was still pregnant.

4

Even before the birth of the new baby she had begun to fall asleep during group meetings and was encouraged to be evaluated for narcolepsy. She then cancelled some overnight visits with R.S. because she was tired, ostensibly as a result of the pregnancy. After the new baby was born, there were signs that T.S. was unable to care for both children. She did not take R.S. to scheduled medical appointments when they were scheduled during his overnight visitation.[4] Out of concern that the mother was being overwhelmed by the demands of the two infants, the agency stopped the overnight visits with R.S. The agency also suspected that the mother was trying to see R.S.'s father because she would not cooperate with having a program escort and became defensive and combative.

On September 4, 2014 when the mother was informed that the overnight visits with R.S. would stop and that supervised visits would be reinstated, the mother felt she was being punished. Despite staff attempts to comfort her, she took a butcher knife from the kitchen and barricaded herself in the bedroom with her newborn, threatening to kill herself and the baby. T.S. was placed on a temporary psychiatric hold, and the child was detained by the agency and placed in the same foster home as R.S. After the mother was released, the Project Pride staff opined that the mother may have been struggling with postpartum depression and a diagnosis of cervical cancer; nonetheless, they doubted that she could care for R.S.

The agency believed that R.S. was not safe in his mother's care and that reunification would be unsuccessful if it were extended. In reaching this conclusion the agency cited (1) the mother's failure to participate regularly in Regional Center service; (2) her lack of success in demonstrating that she can parent R.S. and keep him safe; (3) her inability to follow through with important medical appointments; (4) the fact that she was easily overwhelmed; and (5) the incident where she barricaded herself in her

---

[4]R.S. was being evaluated by the Regional Center and T.M. failed to take him for his genetic testing. It is unclear from the record what R.S.'s diagnosis is. Based on the information provided, his assessment was on-going. According to the September 29, 2014 status report, he was in the seventh percentile for his weight. He had a hernia and was seeing a cranial and audiology specialist, which was monitoring the growth and shape of his head.

room, threatening to kill her younger child and herself. Accordingly, it recommended that reunification services be terminated, that visitation be terminated, and that a section 366.26 hearing be set. On September 29, 2014, in petitioner's absence, the court set a contested 12-month review hearing for October 22, 2014.

Prior to the hearing the agency submitted an updated memorandum, documenting that on October 1, 2014 the Project Pride supervisor reported that petitioner had been arrested for possession of a firearm, making terrorist threats, corporal injury to a child and vandalism. When released from police custody, Project Pride did not permit her to return to their program out of concern for the safety of others who resided there. Reportedly, she had also told other residents that she planned to seek out R.S.'s father and if she found him with another woman, kill him. She also related that she had recently been on an involuntary psychiatric hold because she threatened to chop her therapist into little pieces and send her body parts to her loved ones.

At the 12-month status review, the court adopted the agency's recommendations and set the section 366.26 hearing for February 13, 2015. T.M. then filed a timely notice of intent to file a writ petition. On November 21, 2014, she filed her writ petition in this court, which was opposed by the agency on December 8, 2014. Both parties waived oral argument.

## DISCUSSION

The juvenile court must base its finding that reasonable reunification services have been provided upon clear and convincing evidence. (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 971.) We must uphold those findings if supported by substantial evidence. (*In re Geoffrey G.* (1979) 98 Cal.App.3d 412, 420.) All conflicts in evidence must be resolved and reasonable inferences must be drawn that support the lower court's findings. (*In re Monique T.* (1992) 2 Cal.App.4th 1372, 1378.)

The mother's first argument is that there was not substantial evidence to support a finding that the agency had provided reasonable services to her. Specifically, although the mother attended a substance abuse program, domestic violence, and parenting classes, she received no mental health services, including medical or psychological assessments

6

and treatments. Allegedly, the agency was aware that the mother had "serious cognitive delays," but failed to take into account her special needs. To support her argument petitioner cites *In re Victoria M.* (1989) 207 Cal.App.3d 1317, 1320, a case in which the agency failed to provide specially designed services to meet the needs of a developmentally disabled parent.

The mother in *In re Victoria M.* was "obviously [] developmentally disabled." (*In re Victoria M., supra,* 207 Cal.App.3d at p. 1329.) In discussing the individually tailored services that ought to have been provided to her, the court details the services available through regional centers: specialized services "directed toward the alleviation of a developmental disability or toward the social, personal, physical, or economic habilitation or rehabilitation of an individual," including, but not limited to, "diagnosis, evaluation, treatment, personal care, day care, domiciliary care, special living arrangements, physical, occupational, and speech therapy, training, education, sheltered employment, mental health services, recreation, counseling of the individual . . . ." (*Id.* at pp. 1329–1330.) In sharp contrast to the situation here, such services were never even considered for the mother in *In re Victoria M.* (*Id.* at p. 1330.) Here T.M. was already a regional center client and the agency directed her to re-establish her contacts there. Furthermore, once T.M. had re-established her contact with the regional center, the agency attempted to include the center in T.M.'s case planning. In short, T.M. was instructed and encouraged to avail herself of the very services which are appropriate for a developmentally disabled individual. Additionally, the agency had attempted to have the regional center social worker attend her monthly meetings with T.M. Furthermore, the agency referred the mother for a mental health assessment.

Reunification services need not be ideal, but merely reasonable under the circumstances. (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.) They are reasonable if the agency identified the problems leading to its intervention, offered services to address those problems, maintained reasonable contact with the parent during the service plan, and made reasonable efforts to assist the parent when compliance was difficult. (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 972–973.) Here the agency identified T.M.'s

7

developmental delay, her substance abuse, and her domestic violence problems. It made the appropriate referrals (and attempted to have the mother re-engage in Regional Center services) for all those issues. It kept in regular contact with her, at least when she cooperated with those efforts. When she experienced difficulties, it attempted to address those problems—for example, by decreasing the pressure on her to care for both children after the birth of her youngest child. This led to a potentially violent and frightening incident, which in the agency and the juvenile court's judgment was an indication that reuniting this family would be too dangerous for R.S. Under the circumstances the services offered by the agency were reasonable.

Mother's second argument is that the juvenile court lacked substantial evidence to stop her visits with R.S.[5] She cites evidence as recently as the agency's September 29, 2014 status report, indicating that the visits were going well. She contends that under the standard established in section 366.21, subdivision (h) and California Rules of Court, rule 5.708(n)(2) the juvenile court is not permitted to terminate visitation unless it finds that visitation would be detrimental for the child. Her argument is that because the visits were going well through September 2014, visitation was improperly stopped.

The mother, however, overlooks the significant deterioration in the quality of the visits. Even before her youngest child was born, she was cancelling visits because she was fatigued. After having her youngest child she stopped supervising R.S. properly. Most significantly, she ignores the dramatic September 4, 2014 incident when she barricaded herself in a room with her newborn child, threatening to kill herself and the baby. She overlooks her threat to kill R.S.'s father if she found him with another woman. She fails to discuss her threat to chop her therapist into pieces and distribute them to the

_____

[5]Different courts have employed different standards in reviewing a lower court's determination that visitation would be detrimental to the minor, thereby, justifying the cessation of visitation. (See *In re Julie M.* (1999) 69 Cal.App.4th 41, 48–49 [abuse of discretion]; *In re Daniel C.H.* (1990) 220 Cal.App.3d 814, 839 [mixed substantial evidence/abuse of discretion standard]; *In re Mark L.* (2001) 94 Cal.App.4th 573, 581 [substantial evidence].) Because the juvenile court's decision here passes muster under any of these standards, we need not decide which is the correct standard.

therapist's significant others.  Thus, when the most recent information is taken into account, things were going poorly.  When it terminated visitation, the court noted that the mother had threatened to shoot people and that the agency lacked the ability to prevent a shooting.  In short, the mother's argument here ignores the more recent events which undoubtedly formed the basis of the agency's recommendation and the court's decision to terminate visitation.  Those omitted facts are a valid basis for the juvenile court to have concluded that visitation would be detrimental to R.S.

### DISPOSITION

The petition for an extraordinary writ is denied.  Because the section 366.26 hearing is set for February 13, 2015, our decision is immediately final as to this court. (Cal. Rules of Court, rules 8.452(i), 8.490(b)(2)(A).)


_____

McGuiness, P.J.


We concur:


_____

Siggins, J.


_____

Jenkins, J.